UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| RICHARD L. MILAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 2:09CV00024 AGF |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM AND ORDER**

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Richard Milan was not disabled and, thus, not entitled to supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. For the reasons set forth below, the decision of the Commissioner shall be affirmed with respect to the period from April 30, 2002 (alleged disability onset date) through October 2005, and remanded for reconsideration with respect to the period from November 2005 onward.

Plaintiff, who was born on February 6, 1952, filed for benefits on February 15, 2006, at the age of 54, alleging a disability onset date of April 30, 2002, due to chronic back pain, degenerative disc disease, carpal tunnel syndrome, arthritis, headaches, and sinus congestion. After Plaintiff's application was denied at the initial administrative

level, he requested a hearing before an Administrative Law Judge ("ALJ") and such a hearing was held on February 20, 2008. By decision dated March 12, 2008, the ALJ found, based upon the testimony of a vocational expert ("VE"), that Plaintiff had the residual functional capacity ("RFC") to perform his past work as an offset pressman or pricer/planner. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on April 9, 2009. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole. Specifically, Plaintiff argues that the ALJ erred in (1) assessing Plaintiff's physical RFC by relying on factual and logical errors and substituting his own judgment for that of the medical experts, (2) ignoring objective medical evidence in evaluating Plaintiff's credibility with regard to his back pain, and (3) discounting the opinion of Plaintiff's treating physician (Michael Houser, M.D.). Plaintiff asks this Court to remand the case to the Commissioner with instructions to pay Plaintiff benefits, or alternatively, with instructions to reconsider Plaintiff's claim.

## BACKGROUND

### Work History/Application Form

Plaintiff represented on his application that he worked as an offset pressman and then as a pricer/planner for the Department of Defense from 1979 to 2002. In the former job (1979-1997), his duties included operating an offset printing press and paper cutter,

standing/walking and reaching seven to eight hours each day, and carrying up to 80 pounds on occasion. The latter job included overseeing accounts, unloading paper and toner weighing as much as 50 pounds off trucks, and assessing prices for various printing jobs. (Tr. 99-109.)

Plaintiff wrote that due to his back and neck injuries, he could not sit or stand for prolonged periods of time, and due to the carpal tunnel condition, had pain writing and typing. Plaintiff wrote that these problems first began to bother him in the "1980's," and that he became unable to work on April 30, 2002. Later, on the same page, he wrote that he stopped working on that date because he had retired. (Tr. 108.)

**Medical Record**

The record indicates that Plaintiff received medical treatment for a work-related back injury in 1980. On January 1, 2001, Plaintiff was in a motor vehicle accident, sustaining whiplash injuries to his back, neck, and shoulders. Plaintiff was diagnosed with cervical strain stemming from the accident and was prescribed physical therapy. After eight sessions, Plaintiff reported that his back and neck were feeling better and he was discharged from therapy. (Tr. 144-52.)

On October 28, 2004, Plaintiff saw Michael Houser, M.D., for a physical examination. Plaintiff, who was 6' tall and weighed 199 pounds, reported recurrent back pain. (Tr. 167-68.) He saw Dr. Houser again on November 15, 2005, complaining of constant daily back pain. Plaintiff noted that he was going through a divorce and that his wife wanted him to go back to work, but that he explained to her that his pain was so

3

intense that that was not possible. Dr. Houser noted that Plaintiff was "diffusely tender in his lower back," that his range of motion was "quite limited with about 30 degrees of flexion and zero degrees of extension," and that he experienced pain on straight leg-raising bilaterally. Dr. Houser diagnosed chronic low back pain and mild carpal tunnel syndrome, referred Plaintiff to neurosurgeon Stanley Martin, M.D., prescribed Flexeril (a muscle relaxant), and provided Plaintiff with a note stating that due to Plaintiff's inability to stand or sit for any prolonged time, it would be "difficult for the patient to be gainfully employed," and that he considered Plaintiff "disabled on the basis of chronic low back pain." (Tr. 166, 174.)

Plaintiff saw Dr. Martin on December 6, 2005, and reported low back pain of 25 years duration. The pain radiated to his right thigh, and tended to be worse with activity and movement and better with rest. Plaintiff told Dr. Martin that he was having trouble at home, that his wife wanted him to return to work, but that he did not believe he was able to, although he did not want to go on disability. On examination, Dr. Martin reported that Plaintiff was in no obvious distress, that his gait was normal, and that he was able to walk on heels, toes, and in tandem without difficulty. Noting that Plaintiff experienced low back pain with straight leg-raising, and that his back pain, which appeared to be "mechanical" in nature, had been chronic, Dr. Martin scheduled a lumbar spine MRI and a lower body bone scan. (Tr. 175-76.)

The MRI was conducted on January 5, 2006, and showed "advanced degenerative narrowing" of the intervertebral discs at L3-L4, L4-L5, and L5-S1, with no evidence of

4

disc herniation or spinal stenosis. (Tr. 181.) The bone scan showed "mild degenerative changes" and no recent fractures. Dr. Martin concluded that there was no role for surgery, explaining that he generally did not believe in surgery for low back pain because the risks of surgery outweighed the potential benefits. (Tr. 179.)

On February 7, 2006, Plaintiff was seen by consulting physician Ellis Taylor, M.D., apparently on referral from Drs. Martin and Houser. Plaintiff complained that his back pain had been worsening over the past several years and was interfering with his ability to stand for prolonged periods of time and to sleep. Plaintiff also reported occasional numbness in his lower extremities. Dr. Taylor observed that Plaintiff was well developed and in no acute distress, that his gait was normal, and that he could squat and rise without difficulty. Range of motion of the lower back was limited by pain on flexion, but not extension. Motor strength was normal (5/5), as were the results of a sensory examination. Straight leg-raising caused non-radicular back pain bilaterally, in both seated and supine positions. Dr. Taylor recommended a lumbar epidural steroid injection, which was administered that day. (Tr. 162-64.)

Plaintiff returned to see Dr. Martin on February 22, 2006, stating that it was "at the judge's request," after he had applied for disability benefits. Dr. Martin explained that he did not do disability evaluations, but he examined Plaintiff and restated his opinion that surgery was not advisable. (Tr. 178.)

The record includes treatment notes by Dr. Houser from June, July, August, and November 2006, and February and May 2007. At the June 2006 visit, Plaintiff reported

5

that the epidural injection seemed to make his back pain worse, and that in addition to his continuing back pain, he had been depressed for the last "couple of months." On examination, Dr. Houser noted that Plaintiff's range of motion was "quite limited" due to pain, and that he was "minimally depressed." Dr. Houser prescribed Ultram (a centrally-acting analgesic, used for treating moderate to moderately severe pain) and Fluoxetine (an antidepressant). (Tr. 201.)

By his July 2006 visit, Plaintiff was taking Prozac[1] and reported that his depression was about 60 percent better. His pain medication was switched to Darvocet and his Prozac was increased. (Tr. 200.) In August 2006, Dr. Houser changed Plaintiff's pain medication to Tylenol 3 (with Codeine), and noted that he was "doing better" on Prozac. Plaintiff was in "good spirits"; his back was "still a little diffusely tender." (Tr. 199.) In November 2006, Dr. Houser reported that Plaintiff was doing better but still experiencing back pain. (Tr. 198.) In February 2007, chronic low back pain was again diagnosed. (Tr. 197.) On May 7, 2007, Plaintiff reported that his back pain was worse and that the Tylenol 3 was "barely holding the pain." Dr. Houser noted that Plaintiff had stopped taking Prozac "for some reason" and directed him to resume the Prozac, as well as to start taking Vicodin. (Tr. 196.)

In a letter to Plaintiff's counsel dated May 10, 2007, Dr. Houser stated that Plaintiff had constant daily back pain which made it difficult for him to do "any kind of

---

[1] It is not clear from the record who had prescribed this antidepressant.

activity." Dr. Houser stated that he did not believe that surgery would be helpful and that there was no chance that Plaintiff's condition would improve. He stated that Plaintiff was "totally disabled" and qualified for disability, and that Plaintiff had "been through every treatment that we could give such as physical therapy, medication, steroid injections with no improvement." (Tr. 191.) On an attached form, Dr. Houser indicated that in an eight-hour workday, Plaintiff could not stand for a single hour; could walk for one hour; could sit for two to four hours, but not continuously; and could lift and carry up to 20 pounds. Dr. Houser cited Plaintiff's "bad MRI years ago" as a laboratory test supporting the assessed limitations. (Tr. 192.)

Dr. Houser's treatment notes dated June 11, 2007, stated that Plaintiff had "definitely" noticed that Prozac helped his moods. Dr. Houser also wrote that Vicodin controlled Plaintiff's back pain "fairly well," and that Plaintiff's back was "minimally" tender, but with limited range of motion. Flexeril was added to Plaintiff's medications. (Tr. 195.) On September 24, 2007, Dr. Houser diagnosed chronic low back pain and stable depression, and continued Plaintiff on Flexeril and Vicodin. (Tr. 194.) On December 20, 2007, Dr. Houser noted that Plaintiff had stopped taking Prozac about a month prior (because it upset his stomach) and did not notice much difference. Plaintiff reported constant back pain and he was prescribed Tylenol 4 (with Codeine). (Tr. 193.)

**Evidentiary Hearing of February 20, 2008 (Tr. 25-49)**

Plaintiff testified that he was 56 years old, had a high school GED, and went to technical school for electronics for one year. After two years of military service, he

7

worked for the Department of Defense for 21 years, first as an offset pressman and then for the last five or six years, as a pricer/planner for printing jobs, a position that included the task of unloading trucks. Plaintiff stopped working in 2002 when he was offered a retirement "buy out," and did not look for work after that due to his "physical condition."

Plaintiff acknowledged that he had not sought treatment for back pain since 1980, when a workers' compensation claim for his back injury had been resolved, until October 2005. He testified that the (February 2006) epidural injection only made his back pain worse, and that currently he had "chronic pain" in his lower back that also affected his hips and legs and made him unable to walk "hardly any distance at all" or to stand for more than 15 minutes at one time.

Upon questioning by his representative, Plaintiff testified that in 2003, his back problem became so severe that he could no longer work. He was currently taking Tylenol 4, but he still had pain that affected his ability to sleep, and precluded him from sitting comfortably for more than 15 minutes. At this point in the hearing, Plaintiff's representative asked Plaintiff how he was feeling, as he had been sitting for about 15 minutes. Plaintiff responded that he felt like he wanted to get up.

Plaintiff proceeded to testify that he could stand stationary for about 15 minutes and could walk about one or two blocks before his pain increased. He thought he could lift 15 to 20 pounds, but not continuously. He normally woke up at about 4:00 a.m. due to discomfort in bed. He generally would take a nap at about 11:00 a.m., and another nap in the afternoon. His girlfriend, with whom he was living, did all the household chores.

Plaintiff stated that his job as a pricer/planner involved sitting for five hours a day, walking/standing for the rest of the day, and lifting 50-pound boxes of paper. His duties as an offset pressman required him to stand/walk most of the day, with very little sitting, and to lift and carry boxes of paper.

The VE testified that of the titles listed in the Dictionary of Occupational Titles ("DOT"), Plaintiff's pricer/planner job was most similar to the job of a "property utilization officer," which was a skilled job at the light exertional work level, as generally performed, but at the medium exertional work level as performed by Plaintiff. Plaintiff's offset printing job was a skilled light job in the DOT, but a skilled heavy job as Plaintiff performed it.

The VE testified that an individual of Plaintiff's age, education, and work experience, who could lift/carry 20 pounds occasionally and ten pounds frequently, and who could stand or walk for six hours and sit for six hours in an eight-hour workday, could perform Plaintiff's two past jobs, as they were customarily performed. If such an individual needed a sit/stand option, he could still perform the job of pricer/planner as generally performed.

**ALJ's Decision of March 12, 2008 (Tr. 11-22)**

The ALJ found that Plaintiff met the insured status requirements for disability benefits as of April 20, 2002 (his alleged disability onset date and last date of employment), through December 31, 2007. The ALJ next determined that the combination of Plaintiff's chronic low back pain, mild carpal tunnel syndrome, and mild

9

degenerative disc disease constituted a "severe" impairment, as that term is defined in the Commissioner's regulations, but did not meet the severity level of a deemed-disabling impairment listed in the regulations. The ALJ determined that Plaintiff had the RFC to frequently lift and carry at least ten pounds, occasionally lift and carry at least 20 pounds, stand and/or walk for at least six hours in an eight-hour work day, sit for at least six hours in an eight-hour work day, and occasionally climb stairs and ramps; and that Plaintiff had no mental impairments that imposed functional limitations for at least 12 months in duration.

In support of his RFC assessment, the ALJ noted that despite an alleged disability onset date of April 30, 2002, there was no record of medical treatment from October 2005, and that this was "extremely" inconsistent with allegations of even a severe impairment, and "severely" undermined Plaintiff's claim. The ALJ stated that in addition, Plaintiff's indication that he retired on April 30, 2002, rather than stopped working because he could no longer perform the demands of his job, "seriously" undermined his credibility, and indicated that he could have continued to work.

The ALJ summarized the medical record and concluded that the objective findings of Drs. Taylor, Turner, and Houser, as well as Plaintiff's statements regarding relief through treatment (presumably with regard to his depression), were inconsistent with disabling mental and/or physical impairments. The ALJ pointed especially to Dr. Taylor's notes from his February 2006 examination of Plaintiff, which, according to the ALJ, were inconsistent with Plaintiff's allegations. The ALJ stated that the medical

record was "devoid" of diagnostic test results showing the etiology of Plaintiff's complaints of back pain, and that this too was inconsistent with allegations of disabling impairments.

The ALJ then found that Plaintiff's alleged headaches, sinus congestion, and sleep disturbance with associated fatigue and "mental changes" were severe impairments. The ALJ again stated, however, that the lack of treatment for more than three years since his alleged disability onset date undermined Plaintiff's claim. The ALJ further stated that the lack of strong pain medication was inconsistent with subjective complaints of disabling pain. The ALJ believed that even though Plaintiff had an excellent work history, his receipt of a government pension since retiring showed that there may not have been "a significant incentive to return to work." Based on the VE's testimony, the ALJ concluded that Plaintiff was capable of performing his past relevant work as a pricer/planner and as an offset pressman, as those jobs were generally performed, and that Plaintiff was therefore not disabled within the meaning of the Social Security Act.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th

11

Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." Id. (citation omitted); see also Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-22 (2002). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment or combination of impairments that meets the duration requirement, the claim is denied. Otherwise, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the

impairments listed in the Commissioner's regulations. If so, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work. If the claimant can return to past relevant work as the claimant performed it or as it is generally performed in the national economy the claimant is not disabled. Otherwise, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant has the RFC to perform any other jobs that are consistent with the claimant's vocational factors -- age, education, and work experience. Baker v. Barnhart, 457 F.3d 882, 888 n.2, 894-95 (8th Cir. 2006).

**RFC Determination / Credibility Assessment / Weight Accorded Medical Opinions**

Plaintiff's arguments are directed to the ALJ's physical RFC determination, and are all interrelated. He argues that in determining Plaintiff's physical RFC, the ALJ improperly reached his own medical conclusions, and did not rely upon the medical evidence in the record. Plaintiff points to the January 2006 MRI showing "advanced degenerative narrowing" of intervertebral discs at multiple levels, as well as to the leg-raising and range of motion tests, which, according to Plaintiff, contradict the ALJ's statement that the record was "devoid of diagnostic test results" showing the etiology of Plaintiff's back pain, and contradict the ALJ's characterization of Plaintiff's condition as "mild" degenerative disc disease. Plaintiff similarly argues that in finding Plaintiff's allegations and Dr. Houser's opinion not credible, the ALJ ignored the MRI and other objective tests.

A disability claimant's RFC is the most he can still do despite his limitations. 20

C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), abrogated on other grounds, 524 U.S. 266 (1998), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. at 1023. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. (quoting Hutsell v. Massanari, 259 F.3d 7, 711 (8th Cir. 2001)). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The absence, however, of an explicit reference to "work" in close proximity to the description of the claimant's medically evaluated limitations does not make it impossible for the ALJ to ascertain the claimant's work-related limitations from that evaluation; such explicit language is unnecessary where the medical evaluation describes the claimant's

14

functional limitations "with sufficient generalized clarity to allow for an understanding of how those limitations function in a work environment." Cox v. Astrue, 495 F.3d 614, 620 n.6 (2007); see also Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (finding that substantial evidence supported the ALJ's conclusion that the claimant had the RFC to perform light work, and thus her past work, where medical records indicated that she suffered only mild degenerative changes in her back condition, even though the medical evidence was silent with regard to work-related restrictions such as the length of time she could sit, stand, and walk).

Here, as noted above, the ALJ found that Plaintiff could frequently lift and carry at least ten pounds, occasionally lift and carry at least 20 pounds, stand and/or walk for at least six hours in an eight-hour work day, and sit for at least six hours in an eight-hour work day. The Court concludes that this physical RFC is supported by the record for the period from the alleged onset date through October 2005. Most significantly, the failure to seek medical treatment or take strong pain medication during this period negates Plaintiff's claim that he was unable to work then. See, e.g., Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (stating that the absence of ongoing treatment may be considered as inconsistent with a finding of disability). Furthermore, Plaintiff's statement that he stopped working on April 30, 2002, when he was offered a retirement package, supports the finding that he was not disabled as of that date. See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) ("Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition.").

15

A different picture emerges, however, with respect to the period after October 2005. During this period, Plaintiff availed himself of various pain treatment modalities, and was prescribed increasingly strong prescription pain medications. No medical source opined that Plaintiff could stand and/or walk and/or sit for six hours in an eight-hour workday. Nor does the Court find any medical evidence from which the ALJ could have ascertained that Plaintiff had the physical abilities needed to perform his jobs as an offset pressman or a pricer/planner, as generally performed. It does not appear that the ALJ gave due consideration to the degenerative nature of Plaintiff's impairment. Therefore, even assuming that the ALJ was entitled to discount the opinion of Dr. Houser that Plaintiff was disabled, see e.g., House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination."), the Court believes that the ALJ's decision in this case must be reversed and the case remanded for further consideration with respect to the time period in question. This may require supplementation of the record with the opinion of a medical examiner as to Plaintiff's physical work-related abilities. See, e.g., Wilcutts v. Apfel, 143 F.3d 1134 (ordering that case be remanded for supplementation of the record with the opinion of a mental health professional regarding the Plaintiff's work-related abilities).

On remand, the ALJ should reconsider his finding that the record was "devoid of diagnostic test results" showing the etiology of Plaintiff's back pain, in light of the

January 2006 MRI showing "advanced degenerative narrowing" of intervertebral discs at multiple levels.

## CONCLUSION

The ALJ's decision that Plaintiff was not disabled within the meaning of the Social Security Act is supported by the record with regard to the time period from the alleged onset date until at least October 2005, but not for the period thereafter.

Accordingly,

**IT IS HEREBY ORDERED** that this case is **AFFIRMED in part,** and **REVERSED in part** and **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 28th day of July, 2010.